**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

ELIZABETH BROWN,                )
                                )        CASE NO.    4:09-cv-2870
            Plaintiff,          )
                                )
        v.                      )        MAGISTRATE JUDGE VECCHIARELLI
                                )
COMMISSIONER OF SOCIAL          )
SECURITY ADMINISTRATION,        )
                                )        MEMORANDUM OF OPINION
            Defendant.          )

        This case is before the magistrate judge by consent.  Plaintiff, Elizabeth Brown

("Brown"), challenges the final decision of the Commissioner of Social Security, Michael

J. Astrue ("Commissioner"), denying Brown's application for a period of Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i),

This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

        For the reasons set forth below, the court REVERSES the opinion of the

Commissioner and REMANDS the case for further proceedings.

                        I.  Procedural History

        Brown filed an application for DIB on March 20, 2007, alleging disability as of

February 18, 2007.  Her application was denied initially and upon reconsideration.

Brown timely requested an administrative hearing.

        Administrative Law Judge Wayne Stanley ("ALJ") held a hearing on March 19,

2009.  Brown, represented by counsel, testified on her own behalf at the hearing.  Fred

Monaco testified as a vocational expert ("VE").  The ALJ issued a decision on April 1, 2009, in which he determined that Brown is not disabled.  Brown requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on October 14, 2009, the ALJ's decision became the final decision of the Commissioner.

Brown filed an appeal to this court on December 10, 2009.  Brown alleges that the ALJ erred because (1) the ALJ failed to assign appropriate weight to the opinion of Brown's treating physician; and (2) the ALJ's Residual Functional Capacity ("RFC") assessment is ambiguous and unsupported by substantial evidence.  The Commissioner denies that the ALJ erred.

## II.  Evidence

*A.*     *Personal and Vocational Evidence*

Brown was born on July 10, 1961 and 47 years old on the date of the ALJ's decision.  She has a high school diploma and one year of college.  Her past relevant work includes customer service, home health aide, car harness fabricator, early childhood educator, and day care worker.  Her work ranged from sedentary to heavy.

*B.*     *Medical Evidence*

On February 26, 2007, Brown reported to the Emergency Department at Trumbull Memorial Hospital ("Trumbull"), complaining of chest pain and shortness of breath with exertion.  Tr. at 180-95.  Brown had been treated for bronchitis at Trumbull a week before, and her pains and shortness of breath had lasted one to two weeks by February 26, 2007.  The treating physician ordered an x-ray and a CT scan, which revealed a markedly enlarged heart with small bibasilar infiltrates, small pleural

2

effusions, and vascular congestion.  She was diagnosed with bronchitis and atypical chest pain, referred to Dr. Joseph R. Cordova, and given antibiotics.  Trumbull then released her.

Brown was admitted to Trumbull on March 2, 2007, complaining of shortness of breath accompanied by coughing. Tr. at 199-220.  Dr. Cordova and a consulting physician, Dr. Mazen Mahjoub, diagnosed her as suffering from congestive heart failure, cardiomyopathy, hypertension, diabetes, and pneumonia.  An echocardiogram revealed left atrial and left ventricular enlargment, mild concentric left ventricular hypertophy, severely reduced left ventricular systolic function and an estimated ejection fraction of 15-20%, moderate mitral regurgitation, mild aortic and tricuspid regurgitation, and trace pericardial effusion.  Brown's range of motion, strength, coordination, balance, and gait were normal.  Dr. Mahjoub opined that the cause of Brown's heart abnormalities was probably viral or idiopathic and recommended Enalapril and Coreg in addition to Lasix IV.  Trumbull discharged Brown on March 6, 2007.

On March 16, 2007, Brown again complained to Dr. Mahjoub of cold symptoms and pain.  Tr. at 263, 284.  Brown stated, however, that she had shortness of breath only with a lot of activity.  She also reported feeling better overall with respect to her heart.

Brown returned to Trumbull on March 18, 2007, complaining of numbness and tingling in her upper lip, and was admitted for treatment.  Tr. at 228-45.  Breathing was normal, and she denied chest pain.  Dr. Cordova suspected that the swelling was due to a reaction to her Ace inhibitor and substituted a different medication.  During a follow-up examination on April 3, 2007, Brown complained of mild shortness of breath and

3

fatigue, but otherwise had no complaints.  Tr. at 261.  There were no palpitations.

Brown underwent an echocardiogram on June 11, 2007.  Tr. at 247-48.  Dr. Mahjoub concluded that Brown evidenced left atrial and ventricular enlargement, moderately to severely reduced left ventrical systolic function with an estimated ejection fraction of about 30%, concentric left venticular hypertophy, mild to moderate mitral regurgitation, and mild aortic and tricuspid regurgitation.

On June 19, 2007, Lynne Torello, M.D., an agency physician, completed a Physical Residual Functional Capacity Assessment of Brown based on her record.  Tr. at 250-57.  Dr. Torello opined that Browncould lift 20 pounds occasionally and 10 pounds frequently, could stand or walk for at least two hours in an eight-hour workday and sit for six hours in an eight-hour workday, and had no limitations on her ability to push or pull.  She also opined that Brown could occasionally climb stairs, balance, stoop, kneel, crouch, or crawl and could never climb a ladder, rope, or scaffold.  She asserted that Brown should avoid exposure to extreme heat and cold and all exposure to hazardous machinery.  Dr. Torello found no other functional limitations.

Brown reported to Dr. Cordova for a follow-up examination on September 4, 2007.  Tr. at 259-60.  Brown denied chest pain, shortness of breath, coughing, side effects of medication, or edema in the lower extremities.  Dr. Cordova concluded that Brown's hypertension and pleural effusions had been resolved and her cardiomyopathy was improving.  There was still renal insufficiency, and he recommended continued monitoring.  He recommended a follow-up in three months.

On October 23, 2007, Nicole A. Leisang, Psy. D., examined Brown at the request of the Bureau of Disability Determination.  Tr. at 290-94.  Brown reported that she had

4

suffered a heart attack in February  2007 and complained that she currently suffered

from chest pains and shortness of breath.  Dr. Leisang also wrote as follows:

> She has high blood pressure.  When her pressure increases, she experiences
> dizziness and headaches.  Her headaches have decreased in frequency as she
> noted that "they used to be constant."  Currently, she has one headache per
> week.  She suffers from anemia and has limited energy.  Further, Ms. Brown
> stated that "I lose control of my hand . . . it cramps and I can't pull it back."
> Emotionally, she described herself as "stress [sic] out . . . I'm short fused . . . I
> stay in the house."  She also alluded to sad mood, withdraw, [sic] and anhedonia.
> Currently, she described herself as occasionally anxious and depressed. She
> stated that she worries often and alluded to a sense of impending doom.
> Nonetheless, she denied panic attacks or avoidant behavior.

Tr. at 290.  Brown's then-current prescriptions inculded Spironolact, ferrous sulfate,

Furosemide, potassium, Diovan, and Coreg.  Brown reported that she spent most of her

time alone, although she had regular contact with her family and granddaughter.  Her

activities included watching television, listening to music, and reading.  She asserted

that she had no friends and left the house only when necessary.  Dr. Leisang found

Brown to be depressed but otherwise normal in appearance, conversation, and thought.

Brown denied suicidal ideation but reported poor appetite and sleep, crying, and limited

energy.  Remote recall was adequate, but short-term memory, attention, concentration,

and abstract reasoning ability were marginally adequate.  Arithmetic skills were weak.

Dr. Leisang described Brown's intelligence as average.  In her discussion of Brown's

work-related mental abilities, Dr. Leisang assessed Brown as moderately to seriously

impaired in her ability to relate to others, including fellow workers and supervisors,

which would give her difficulty in relating adequately to others in completing simple,

repetitive tasks.  She assessed Brown as mildly to moderately impaired in her ability to

understand, remember, and follow simple directions, although she would be able to

5

understand and retain simple instructions.  Dr. Leisang also found Brown mildly to moderately impaired in her ability to maintain attention, concentration, persistence, and pace and in her ability to withstand the stress of day-to-day work activity.  Dr. Leisang assigned Brown a Global Assessment of Functioning ("GAF") of 49,[1] although she rated the severity of Brown's symptoms between 61 and 70.

On November 21, 2007, Bruce Goldsmith, Ph.D., completed a psychiatric Review Technique assessing Brown.  Tr at 295-312.  Dr. Goldsmith opined that Brown suffered from a recurrent and moderate major depressive disorder.  He further opined that Brown had mild limitations in her activities of daily living and moderate limitations in maintaining social functioning and maintaining concentration persistence, and pace.  According to Dr. Goldsmith, Brown was moderately limited in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticisms from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  Dr. Goldsmith concluded:

Clmt able to work at a steady pace to sustain simple and complex tasks of a

---

[1]  A GAF of 41 to 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.

6

familiar nature.  She would work best in situations where duties are relatively
static and changes can be explained.  Clmt would work best in environments
which do not require persuading others to follow demands or resolving [sic]
conflicts.

Tr. at 311.

Trumbull admitted Brown for treatment on December 3, 2007.  Tr. at 313-60.
Brown complained of epigastric and right hypochondrium pain.  Tests revealed
esophageal erosion from gastroesophageal reflux and duodenitis.  A daily dose of
Protonix resolved the problem.  A chest x-ray taken at this time showed decreased
cardiomegaly compared to Brown's previous study.  Attending and examining
physicians included Dr. Mahjoub, who recommended a slight increase in Brown's dose
of Coreg.  Tr. at 325-26.

Dr. Mahjoub wrote the following note on February 12, 2008:  "Due to severe
cardiomyopathy, patient is totally disabled cardiac wise and is unable to perform any
type of work for at least one full year.  Thank you."  Tr. at 362.

On April 25, 2008, Dr. Mahjoub completed a Cardiac Impairment Questionnaire
assessing Brown's condition.  Tr. at 364-69.  Dr. Mahoub noted that he had treated
Brown from March 16, 2007 to December 18, 2007 and diagnosed Brown as suffering
from heart disease, as supported by findings of edema and dizziness/loss of
consciousness.[2]  When asked to identify the laboratory and diagnostic tests which
demonstrate or support his diagnosis, Dr. Mahoub wrote, "Echo done showing left atrial
& [left ventrical] enlargement.  Mod. to sev. reduced systolic function w. [ejection

---

[2]  When asked for "Other clinical signs or comments," Dr. Mahoub noted, "Patient
has severe cardiomyopathy."  Tr. at 365.  That is, Brown has a non-inflammatory disease
of the heart muscle.  This is a diagnosis, not a clinical sign.

7

fraction] of 30%.  Concentric [left ventrical] hypertrophy, mild to moderate [mitral regurgitation,] mild aortic and tricuspid [regurgitation]."  Tr. at 365.  He listed difficulty breathing as Brown's primary symptom and found Brown's symptoms and functional limitations reasonably consistent with her physical and emotional impairments.  Dr. Mahoub identified Brown's medications as Omnicef, Spironalactone, Furosemide, potassium, and Coreg.  He also noted that Brown would have good days and bad days but that she would be unable to work until February 12, 2009 unless otherwise noted.

Brown reported to Trumbull on July 18, 2008, complaining of right-side chest pain radiating into her back and shoulder and asserting that the pain had worsened over the past week.  Tr. at 397-438.  The admitting physician gave a preliminary diagnosis of atypical chest pain, hypertension, and cardiomyopathy with no acute failure.  A series of tests[3] revealed a dilated left ventricle with an ejection fraction of 39%, no definite evidence of ischemia, cardiomegaly, and no pulmonary embolism.  Brown was assessed as having a low risk of heart attack.

On March 18, 2009, Dr. Mahjoub wrote a letter addressed "To Whom It May Concern" regarding Brown's condition.  Tr. at 453.  Dr. Mahjoub wrote that Brown suffered from severe cardiomyopathy of viral or idiomatic origin.  He reviewed Brown's medical history related to her visits to Trumbull on March 2, 2007 and June 11, 2007. He then concluded:

> Ms. Brown's medical history and physical examinations describe characteristic symptoms and signs of limited cardiac output associated with abnormal findings on appropriate imaging.  These findings include edema, dizziness, easy fatigue,

---

[3]  These tests included the intravenous infusion of adenosine to induce stress and an infusion of Tc-99m tetrofosmin, followed by imaging.

8

weakness, shortness of breath, cough, orthopnea, and paroxysmal nocturnal dyspnea. Ms. Bown's persistent symptoms of heat failure very seriously limit her ability to initiate, sustain, or complete her activities of daily living.

In my best medical opinion, Ms. Brown is totally disabled from a cardiac standpoint and unable to perform any type of work for at least one year.

Tr. at 453.  Brown sent this letter to the ALJ on March 27, 2009, after the hearing and four days before the ALJ issued his unfavorable decision.  The letter was not included in an updated exhibit list attached to the ALJ's decision.  Brown, therefore, included it as an exhibit attached to her appeal to the Appeals Counsel.

Also attached to Brown's appeal to the Appeals Counsel as an additional exhibit was a Multiple Impairment Questionnaire completed by Dr. Mahjoub on August 21, 2009 assessing Brown's condition.  Tr. at 444-51.  In the questionnaire, Dr. Mahjoub diagnosed Brown as suffering from cardiomyopathy and essentially benign hypertension, and opined that she was stable with treatment.  He noted as clinical findings supporting his diagnosis dyspnea with moderate activity, edema, high blood pressure, and fatigue.  He also cited an echocardiogram showing left atrial and ventrical enlargement, a 30% reduction in left ventrical systolic function (described as a "moderate to severe" reduction), mild to moderate regurgitation, and mild aortic and tricuspid regurgitation as laboratory and diagnostic test results supporting his diagnosis. Dr. Mahjoub described Brown's major symptoms as dyspnea with moderate activities, edema, and fatigue. When asked to describe the nature of any pain Brown was experiencing, Dr. Mahjoub wrote "Dyspnea with moderate activities" and cited the 30% reduction in systolic function and a blood pressure of 177/104 as precipitating factors leading to pain  Tr. at 445-46.  He also estimated Brown's pain as about 6 on a 10-point

9

scale and her fatigue as 8 on a 10-point scale.  He also opined that Brown was not able

to completely relieve her pain with medication.  According to Dr. Mahjoub, Brown was

limited to sitting for no more than four hours in an eight-hour work day and standing or

walking for no more than one hour in an eight-hour work day.  He recommended that

Brown not sit continuously for more than 30 minutes.  Dr. Mahjoub also opined that

Brown could lift up to ten pounds occasionally, could carry five pounds, occasionally,

and had significant limitations in doing repetitive reaching, handling, fingering, or lifting.

He found that Brown had moderate restrictions in her ability to grasp, turn, and twist

objects and in using her arms for reaching.  He also asserted that Brown had minimal

restrictions in her ability to use fingers and hands for fine manipulation.  Dr. Mahjoub

found each of the following:  (1) Brown's symptoms were likely to increase in a work

environment; (2) her condition interfered with her ability to keep her neck in a constant

position (such as would be required by looking at a monitor); (3) she could not do a full-

time job that requires activity on a sustained basis; (4) her pain and fatigue would

frequently be severe enough to interfere with attention and concentration; (5) Brown's

impairments would last for at least 12 months; (6) her dyspnea with moderate activity

could lead to depression, thus contributing to the severity of her symptoms; (7) Brown

was not a malingerer; (8) any more than low stress would cause an increase in her

blood pressure; (9) Brown would have to rest at unpredictable times and for

unpredictable durations during a work day; (10) she would be likely to have "good days"

and "bad days"; (11) she would be absent from work as a result of her impairments

more than three days a month; and (12) Brown required a job that permitted ready

access to a rest room.  Dr. Mahjoub also opined that Brown needed to avoid fumes,

gases, temperature extremes, humidity, and dust and should not push or pull.  In conclusion, he added "[patient] is disabled from work until further notice from the cardiac standpoint."  Tr. at 450.

C.      *Hearing testimony*

The ALJ held a hearing on March 19, 2009 at which Brown and a VE testified.  Tr. at 30-72.  Brown testified that she was 5' 1" and weighed about 200 pounds.  According to Brown, she regularly experiences tightness and pain in her chest despite medication, even when sitting or lying down.  She avoids using stairs at home as much as possible because using them makes her short of breath.  She performs light housework, such as vacuuming and washing dishes, and this does not bother her as long as she works at her own pace.  Brown also testified that she does puzzle books, reads, attends church twice a week,  and occasionally shops.  She does not cook or do substantial grocery shopping.  Brown estimated that she was able to sit for about an hour before she has to get up and walk around or change positions.  According to Brown, she cannot stand in one place for more than ten minutes and can walk for about 15 minutes.  Brown also estimated that she could lift 20 pounds.  When asked if she had a job that allowed her to sit then stand when necessary and whether she could do that for an eight-hour day, Brown replied "I can try."  Tr. at 56.  Brown also described problems with her hands and feet cramping, memory problems, anxiety, and good days and bad days for fatigue.

The ALJ asked the VE five hypothetical questions.  In the first, he asked the VE whether an individual of Brown's age, education, and work experience, restricted to light exertion, who had to avoid all exposure to workplace hazards for more than two-thirds

11

of the workday, were restricted to jobs with few workplace changes and that did not involve persuading others or resolving conflicts could perform Brown's past relevant work.  The VE said that such a person could not.  The ALJ then asked if such a person could perform other work in the national economy at the sedentary exertional level.  The VE answered that such a person could perform about 600,000 jobs in the national economy, some at the light exertional level and some at the sedentary extertional level..  The ALJ  next asked the VE to suppose an individual who is limited to sitting 60 minutes at a time, standing 10 minutes at a time, and walking 15 minutes at a time but who could go back and forth in these positions over an eight-hour day; who can lift 20 pounds occasionally and eight pounds frequently but not lift objects from below waist level; who would not be required to reach overhead with her right arm; who was restricted to simple instructions and tasks due to memory difficulties.  The ALJ asked if such a person could perform Brown's past relevant work, and the VE said that such a person could not.  The ALJ then asked if such an individual could perform any other jobs in the national economy, and the VE said that such an individual could perform any of the sedentary jobs described earlier but not the light jobs.  When the ALJ limited the hypothetical individual to working less than eight hours, the VE said that there were no jobs that such an individual could perform.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second,  the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining that Brown was not disabled, the ALJ made the following relevant findings:

3.    The claimant has the following severe impairments:  viral cardiomyopathy,

13

obesity, and major depression.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the following residual functional capacity:  she is able to sit for 60 minutes at a time, stand for 10 minutes, and walk for 15 minutes; she is able to sustain combined activities for 8 hours a day; she is able to lift 20 pounds occasionally and 8 pounds frequently; she cannot do any bending below the waist level or overhead reaching with the right arm; and she is able to follow simple instructions and perform simple tasks.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born on July 10, 1961, and is presently 47 years old, which is defined as a younger individual age 18-49.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 18, 2007, through the date of this decision.

Tr. at 75-87.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124,

14

125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Brown alleges that the ALJ erred because (1) the ALJ failed to give appropriate weight to the opinion of Brown's treating physician and (2) the ALJ's RFC evaluation was ambiguous and was not supported by substantial evidence.

B. *Whether the ALJ erred in failing to give sppropriate weight to the opinion of Brown's treating physician*

Brown argues that the ALJ erred in failing to give appropriate weight to the opinion of her treating physician, Dr. Mahjoub, that she was unable to work.  The Commissioner replies that Dr. Mahjoub was not a treating physician and that the ALJ properly accorded little weight to his opinion.

The opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v.*

15

*Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).

"[W]here the expert medical opinions expressed by doctors who have examined and treated an applicant state that he is disabled from engaging in any substantial gainful activity, a contrary finding by a hearing examiner is in the realm of speculation and reversible error in the absence of countervailing substantial evidence." *Walston v. Gardner*, 381 F.2d 580, 585 (6th Cir. 1967).  Moreover, the ALJ must provide "good reasons" for the weight assigned to treating physicians.  Failure to do so does not constitute harmless error and requires remand. *Wilson v. Commissioner of Social Security*, 378, F.3d, 541, 544 (6th. Cir. 2004).

Dr. Mahjoub first saw Brown during her stay at Trumbull from March 2-6, 2007 as a consulting physician.  He diagnosed her as suffering from congestive heart failure, cardiomyopathy, hypertension, diabetes, and pneumonia; interpreted the echocardiogram and other tests administered to Brown; opined that the cause of Brown's heart abnormalities was probably viral or idiopathic; and recommended a particular drug regimen as treatment.  Dr. Mahjoub saw Brown again at his office on March 16, 2007, when Brown complained of cold symptoms and pain.  Brown said at that time that she had shortness of breath only with a lot of activity and reported feeling better overall with respect to her heart.  Dr. Mahjoub saw Brown for a third time in June

16

2007 when he interpreted an echocardiogram taken on June 11, 2007.  Brown identified

Dr. Mahjoub as her cardiologist at her hearing.  There is no ground upon which to claim

that Dr. Mahjoub was not one of Brown's treating physicians.

The Commissioner objects that Brown's treating physician was Dr. Cordova, not

Dr. Mahjoub, and that Dr. Mahjoub saw Brown on only three occasions.  This argument

is not well-taken.  There is nothing in the relevant statutes or the federal regulations that

limits a patient to one treating physician, as the Commissioner seems to imply.  Dr.

Cordova was Brown's general practitioner; Dr. Mahjoub was her cardiologist.  In

addition, that Dr. Mahjoub saw Brown on only three occasions does nothing to disqualify

him as a treating physician.  The ALJ may consider the length and frequency of the

patient-physician relationship in assessing how much weight to give a treating

physician's opinion, 20 C.F.R. § 404.1527, but such considerations do not undercut a

physician's status as a treating physician.

Dr. Mahjoub opined that Brown could not work on four occasions.  On February

12, 2008 Dr. Mahjoub wrote:  "Due to severe cardiomyopathy, patient is totally disabled

cardiac wise and is unable to perform any type of work for at least one full year."  Tr. at

362.  He provided no support for or elaboration upon that assertion.  On April 25, 2008

Dr. Mahjoub opined that Brown would not be able to work until February 12, 2009.  Tr.

at 368.  He supported this opinion by noting, "Echo done showing left atrial & [left

ventrical] enlargement.  Mod. to sev. reduced systolic function w. [ejection fraction] of

30%.  Concentric [left ventrical] hypertrophy, mild to moderate [mitral regurgitation,] mild

aortic and tricuspid [regurgitation]."  Tr. at 365.  He listed difficulty breathing as Brown's

primary symptom and found Brown's symptoms and functional limitations reasonably

17

consistent with her physical and emotional impairments.  On March 18, 2009 Dr.

Mahjoub wrote a letter in which he reviewed Brown's medical history related to her visits

to Trumbull on March 2, 2007 and June 11, 2007.  He then concluded:

> Ms. Brown's medical history and physical examinations describe characteristic symptoms and signs of limited cardiac output associated with abnormal findings on appropriate imaging.  These findings include edema, dizziness, easy fatigue, weakness, shortness of breath, cough, orthopnea, and paroxysmal nocturnal dyspnea.  Ms. Bown's persistent symptoms of heart failure very seriously limit her ability to initiate, sustain, or complete her activities of daily living.
>
> In my best medical opinion, Ms. Brown is totally disabled from a cardiac standpoint and unable to perform any type of work for at least one year.

Tr. at 453.  Brown sent this letter to the ALJ on March 27, 2009, after the hearing and

four days before the ALJ issued his unfavorable decision.[4]  Finally, on August 21, 2009,

Dr. Mahjoub completed a Multiple Impairment Questionnaire in which he opined that

Brown was "disabled from work until further notice from the cardiac standpoint."  Tr. at

450.  In support of this opinion, he reviewed in some detail the tests and clinical

symptoms that supported this opinion.  This questionnaire was first submitted to the

Commissioner on appeal from the ALJ's decision.

In dismissing Dr. Mahjoub's opinion that Brown was unable to work, the ALJ

wrote as follows:

> The undersigned recognizes that Dr. Mahjoub, her treating cardiologist, has opined that the claimant has been totally disabled as a result of her cardiovascular condition (Exhibits 12F and 13F).  However, I do not afford much weight to his assessments, as there are more recent reports from the physician beyond about December 2007, when the physician noted an improvement in the claimant's cardiovascular status (Exhibit 11F).  The physician's assessment of

---

[4]  As noted earlier, this letter was not included in an updated exhibit list attached to the ALJ's decision.  Brown, therfore, included it as an exhibit attached to her appeal to the Appeals Counsel.

total disability in February 2008 was prepared on a prescription pad, without accompanying clinical details.  (Exhibit 12F).  His assessment prepared in April 2008 was based on the results of an examination conducted in December 2007 and the results of an echocardiogram which was not the most current (Exhibit 13F).  The undersigned believes that later medical evidence as well as the totality of the medical record tend to support my conclusion that the claimant has recovered sufficiently to perform a range of light work.

(Tr. 85).

There are several problems with the ALJ's statement.  First, there is no later

echocardiogram in the record than the one cited by Dr. Mahjoub in April 2008.  As

plaintiff notes, the only more current and relevant cardiac test to which the ALJ might be

referring was a stress test administered on July 19, 2008.  TR. at 397.  This may or may

not be the "more recent reports" to which the ALJ refers.  Such reports are not found at

Exhibit 11F, so cited by the ALJ, as the reports in Exhibit 11F run only from March 2007

through December 2007, with the last report coming from Dr. Mahjoub.  Tr. at 348-61.

Second, in discussing the results of the test administered on July 19, 2008, the ALJ

asserted that the test "revealed an ejection fraction of almost 40% (normal is 50%), well

above the values obtained during the claimant's hospitalization back in March 2007."

Tr. at 80-81.  There is no medical evidence in the record that a 50% ejection fraction is

"normal."  In so saying, therefore, the ALJ is not relying on information in the record.[5]

_____

[5]  Plaintiff noted the following:

A brief survey of on-line resources demonstrates that a 50% ejection fraction is, at best, on the borderline of normal.  Dr. Martha Grogan, a cardiologist from the Mayo Clinic, states that a normal ejection fraction is 55 to 70 percent (http://www.mayoclinic.com/health/ejectionfraction/ AN00360, accessed 3/26/10). Online literature from the Cleveland Clinic states t hat a normal ejection fraction is between 50 and 70% (http://my.clevelandclinic.org/heart/disorders/heartfailure/ejectionfraction.aspx, accessed 4/5/10).

19

Third, in asserting that "the totality of the medical record tend[s] to support my conclusion that the claimant has recovered sufficiently to perform a range of light work," the ALJ is once again basing his decision on information that is not supported by the evidence, as no medical opinion in the record asserts that Brown's symptoms indicate that she is capable of performing light work.  Thus, while the ALJ has some medical reason for discounting the opinion of Dr. Mahjoub on the basis of a later test not mentioned in Dr. Mahjoub's assessment's, the ALJ had no medical basis for determining the extent to which Dr. Mahjoub's opinion that Brown was physically incapable of working should be discounted.  Consequently, without a supporting medical opinion in the record, the ALJ had no medical basis for rejecting Dr. Mahjoub's opinion or for determining that Brown was capable of "a range of light work."[6]  For these

---

Plaintiff's Brief (Doc. No. 13), p. 11.  Plaintiff also noted that the 39% ejection fraction detected on July 19, 2008 is closer to the 30% ejection fraction necessary to establish disability pursuant to 20 C.F.R. 4.02(A)(1) than to the 50% ejection fraction the ALJ cites as being "normal."  *Id.* at 11-12.

[6]  Brown also argues that the ALJ erred in failing to determine whether Brown was disabled prior to the July 19, 2008 stress test that showed her ejection fraction had increased from 30% to 39%.  The problem with this argument is that the record contains insufficient evidence of a 12-month period of disability ending July 18, 2008.  The earliest opinion by Dr. Mahjoub that Brown was disabled was given on February 12, 2008.  This opinion did not cite any objective tests or clinical observations as support.  Dr. Mahjoub's subsequent opinions that Brown was disabled cited both objective tests and clinical observations in support.  None of his observations, however, opined as to when Brown first became disabled.  Moreover, Dr. Mahjoub's last clinical contact with Brown was on December 3, 2007.  Dr. Mahjoub never specified which clinical observations were used in forming his opinion that Brown was disabled.  Consequently, there is insufficient evidence in the record from which to conclude that Dr. Mahjoub believed that Brown was disabled prior to December 3, 2007.  From December 3, 2007 to July 18, 2008, when the stress test revealed an increased ejection fraction, is less than the 12-month period required for a finding of disability.  Thus, if the ALJ erred in failing to find whether Brown was disabled prior to July 18, 2008, that error was harmless error.

reasons, the ALJ's rejection of Dr. Mahjoub's opinion was without "countervailing substantial evidence" sufficient to justify that rejection.[7]

For these reasons, the ALJ's opinion should be reversed and the case remanded for further proceedings.

B.    *Whether the ALJ's RFC evaluation was ambiguous and was not supported by substantial evidence*

Brown argues that the ALJ erred because his opinion was ambiguous and not supported by substantial evidence.  Specifically, Brown contends that the ALJ (1) failed to unambiguously specify the exertional category which best describes Brown's RFC[8] and (2) failed to unequivocally specify the frequency with which Brown would need to alternate between sitting and standing, as required by SSR 69-9p.  The Commissioner responds that the record provides substantial evidence supporting the Commissioner's opinion.

As this case must be remanded for other reasons, the court directs the ALJ to examine Brown's assertions and to clarify his RFC finding.

---

[7]   The Commissioner responds that the record justifies rejecting Dr. Mahjoub's opinion.  That is beside the point.  It is the ALJ's responsibility to explain why the opinion of the treating physician is not given controlling weight.  No amount of *post hoc* reasoning by attorneys representing the Commissioner can substitute for an ALJ's failure to assume his responsibilities in this respect.

[8]   In particular, Brown points to the apparent discrepancy between the Commissioner's finding that Brown was capable of a range of light work and the VE's opinion that she was incapable of performing light work.

21

VII.  Decision

For the reasons set forth above, the court REVERSES the opinion of the Commissioner and REMANDS the case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**


Date:  August 31, 2010                    s/ *Nancy A. Vecchiarelli*
                                          Nancy A. Vecchiarelli
                                          U.S. Magistrate Judge